I feel compelled to use a nanosecond of my limited time to address the case that Apelli mentioned in his letter about the expert that Council promised that didn't get called to an expert. If you have a respectable expert, their opinion is necessarily fluid. They can change right on the stand during your direct examination. If something is presented to them, that changes their opinion. An alibi witness, as presented in Council's opening argument in the Olivares case, is a different matter. It's a question of, that was his whole case. And in addition to Olivares' boss, there was his wife, Gloria, who for some reason wasn't called either. Now, Gloria was going to testify that he came home at 4 o'clock, is that correct? That's correct. And what time was the murder? Well, it was about 3.30. Okay, so that might have helped, it might not have helped, it wouldn't have done much? I think it would have done a lot because it showed that here was a man that was following his normal routine. He went to work and he came home. He came home driving his white truck and he'd been working for 10 years. He wasn't, you know, off contemplating drive-bys. Even if he could have, you know, gotten there possibly, it was much more unlikely. And we don't know if the boss had got on the stand and said, I'm unsure of the time, and then Gloria said he came home at 4, it kind of would have been a lot better than what Olivares got. He got nothing and he'd been promised much. So moving on, I would like to take issue with a footnote on page 21 of Appelli's brief. I think it's important because he claims that petitioner's new evidence can't be considered in evaluating the prejudice flowing from the crockery violation. I disagree with that because the Court of Appeal on direct appeal didn't ever consider Crawford. They didn't even consider Rutan. They just did a Strickland analysis and that's a different analysis, which I mean, I think my client should have prevailed under Strickland, but that isn't the point. The Court of Appeal, I don't even think that the Superior Court considered a Crawford analysis because there's a little comment on the excerpt, I think it's excerpt 6, that Crawford wasn't retroactive in any way. It made no difference, but Crawford wasn't retroactive. So I don't think Crawford, we have to Sotomayor Does Crawford make any difference? The court, State court concluded that the testimony was inadmissible because hearsay and that should have been excluded, would have been excluded if there had been an objection made. So doesn't that throw the case into Strickland? Well, I think the standard of error is different. If he has a freestanding Crawford claim, it's beyond a reasonable doubt, harmless error on the side that the prosecution has to prove. If it's a Strickland error, then the burden shifts to the defendant to prove that it's reasonably probable that the results would have been different. So I'm just, I think for this Court's looking at it, I don't think that Strickland, we have to assume that Crawford was applied by the California Supreme Court because it's a silent denial. But I don't think the Court of Appeal even applied Crawford because they're citing, they gave us string cites which are really helpful. But the prosecution and the courts all conceded that it was error to admit it. So then the question becomes whether it's harmless error. Exactly. That's my point. My point is the standard of error, and which is important to this Court, which is going to use the Brecht standard, whereas if you're using just the Strickland standard, then it's a double deference. What is it that the jury heard about what Moreno said that is harmful to your client? Well, Moreno, under interrogation, told the police officer, we don't know what prompted him to say this, but he said that, I know Gogo and Gogo, I last saw Gogo with Marcos Torres, who was the murder victim that had died a week earlier, presumably at the hand of the gang that my client was purportedly associated with. And so it, and I saw him, with him, about in April, driving in a car. So he made my client into not only A different car. Oh, it doesn't, the car is not really relevant, but he saw him in the company of this dead gang member. Wasn't there substantial evidence that your client was affiliated with that particular group, and that he did go by the name Gogo? Ten years earlier, when he was 13 or 14 years old, he'd gone to YA, and he, it wasn't a very serious crime, apparently, because he wasn't priored. It was not a strike. And he was paroled from YA, and he was on YA parole, and from all accounts, he was leading a law-abiding life. He still retained, I mean, I guess, the nickname Gogo, but as we proved, there were many Gogos. And the other thing about that, we don't even know that the Gogo that was being referred to by any of these people was my client, because no one was ever asked to make that connection. No one was ever shown a picture and saying, is this the Gogo you were talking about? So even, it's so tenuous that my client is even that Gogo. And, you know, counsel, of course, conceded he was Gogo from Ford Marivella, but we don't really know that. We know he was maybe when he was 13. Can we, can we come back to the point with which you began, and that is the alibi witness that goes south? Because that seems to me the hard part of the case. The defense attorney promises an alibi witness. The alibi witness doesn't show up. Why do we have ineffective assistance of counsel? What appears to have happened is that the alibi witness goes south at the last minute saying, I really can't do that. That does happen from time to time. So where's the IAC? Well, if they don't show up, you get a subpoena. They're under subpoena. But in this particular instance, the argument wasn't... Well, he comes in and he says, you know, I really can't testify to that. He said, I wasn't sure what time he left. Yeah. But he wasn't going to deny that he'd been working for him for ten years and that he had worked there that day, which is quite helpful. I mean, if he left even an hour earlier or two hours earlier, I mean, you know, I mean, even if... No, no. But focus me. So what do we know about what the alibi witness said at the last minute as he backed out? Why was he backing out? Well, we know something about that later on, which was during the habeas we submitted. I had an investigator interview him. But I think we have to go by what trial counsel said in his letter, that the alibi witness was reluctant to testify because he couldn't remember what time. But presumably, he at one point had been interviewed and had said what time. So perhaps his memory could have been refreshed with his earlier statement. Yeah, but... Or even if he said, I don't remember, then, well, sir, didn't you tell my investigator on, you know, such and such a date or didn't you tell me earlier that, in fact, he left at, you know, 2.30? And if he said no, then perhaps it could have been refreshed with his previous statement. Okay. So what do we know based on what came out of habeas about what, why he went south and what he would have said had he been put on the stand? On habeas, he claimed pretty much that he would have stuck with this. He was willing to testify and would have testified in accordance with his original statement to counsel. But he was, had been, was intimidated because he got a call that he perceived to be from law enforcement, which, I mean, in my mind, I thought, yeah, he's been paying my client under the table for all these years and somebody probably called him on it. But it could be any reason. It doesn't necessarily mean that it was really law enforcement, just that's what he perceived. Yeah, yeah. I mean, I'm troubled by that, but I have trouble finding under AEDPA that I see such that we can grant. Well, what about Gloria, his wife? I mean, even calling her and she would have said he went to work that day. And then the combination of whatever, Mr. I think that's a close question on strategy, whether you want the wife to come and say, yeah, he came home at 4 o'clock, which is after the murder. It's perfectly consistent with the prosecution's theory and she's going to reinforce it. She's not an alibi witness. She's going to say, well, that's the time he usually came home. But it doesn't change anything that he could have been where the prosecution said he was. And I can see, was your husband upset when he came home from work? Did he look normal? Was he sweating? I mean, I can see a lot of questions that could have been asked of her. Was this a normal day? Did you have dinner then? Sure. And then she gets an opportunity to be cross-examined by the district attorney and it may or may not turn out well. But that strikes me as a strategic question and one that a lawyer has to weigh. I don't know how we get to second-guess that at this point. Okay. Let's look at the point of view that he didn't really have to promise this alibi if he wasn't certain that he was going to be calling her. Right. But he's not responsible for Romero backing out. And at that point, he's got to make a strategic decision as to whether he wants to issue the subpoena, whether he wants to put him on there and have Romero say, I don't know, I don't know when he left. That's not going to help his client either. That's his principal defense. How could it have possibly been worse than not putting him on at all? But isn't, I mean, the Supreme Court has reiterated on multiple occasions that in evaluating Strickland in a habeas case from state court, this court doesn't exercise independent judgment. We don't treat it as we would direct appeal from a conviction in federal district court. We've got to doubly defer. We defer initially to the state court's decision, and then we defer to the counsel's decision. So even if we agreed with you that resolving the matter by ourselves, we would find ineffective assistance of counsel, that's insufficient. I agree, Your Honor, that there's a double deference with Strickland. That's why I was trying to make my first point, that with respect to the Confrontation Clause issue, that you have a combination of errors here, and the Confrontation Clause issue is strictly Brecht. There's no double deference involved. And the other line of deference, isn't there? No, Your Honor. You mean apply Brecht? Under this Court's jurisprudence, my understanding is that, and I think Respondent concedes that in his brief as well, that on the Confrontation Clause issue, the straight Confrontation Clause claim, as opposed to the Strickland claims, therefore, you will just apply Brecht. However, on Strickland, I do agree there's a double deference involved. I'd like to save a minute for rebuttal, unless there's another question. We've taken you over time. Let's hear from the other side, and we'll give you a minute. Thank you. Good morning, Your Honors. Deputy Attorney, excuse me, Deputy Attorney General Gary Lieberman for Respondent. The alibi was not Mr. Oliveira's whole case. Defense counsel attacked the prosecution's case based on the eyewitness identifications, and defense counsel also suggested that Mr. Oliveira was no longer an active gang member at the time of the crime. And he, in fact, introduced evidence that Mr. Oliveira actually lived in rival gang territory at the time of the crime. So the alibi was not the entire case. Defense counsel attacked the eyewitness identifications and also had the additional argument that Oliveira was no longer active in the gang. What would have been the downside to putting Oliveira's wife on? Well, it certainly, I don't know that they're necessarily, well, it would have just been meaningless. And as Your Honor said, it certainly wouldn't supply an alibi for Mr. Oliveira to come home at 4 o'clock. How far away was the murder from his home? Just three to four miles. And the murder occurred somewhere nearly before 321 in the afternoon. So the wife wouldn't have helped at all. And of course, she would have no personal knowledge as to whether Mr. Oliveira actually went to work that day or what time he allegedly left Mr. Ramirez's property. And one thing which weighs into the strategic decision that defense counsel had to make is the harmfulness to Mr. Oliveira's of putting on an unpersuasive alibi. You know, the prosecutor, I mean, had Mr. Ramirez got on the stand and been wishy-washy as to the time that Mr. Oliveira has left his property and couldn't say... Did we, or rather, did the defense attorney have a written earlier statement from the employer? Or was it just you told my investigator? Do we know? The record is silent, Your Honor, as to whether there was a written statement or not. However, the record reflects that the defense investigator and trial counsel himself both interviewed Mr. Ramirez on more than one occasion prior to interviewing him again at the time of his actual testimony. Right. So it does strike me that when the employer gets on the stand and says, I can't remember, and the defense attorney says, didn't I interview you earlier? Yes. Didn't my investigator early interview you earlier? Yes. I'm assuming those answers will come back instead of I don't remember. Yes. Didn't you say X to me? I don't remember. Didn't you say X to my investigator? I don't remember. Was he threatened by anyone he associated with the gang of the defendant? I don't know. You know, at that point, I'm thinking that's a fairly powerful testimony because now we know why he won't remember. The significant point here, though, Your Honor, is that Mr. Oren's declaration, the habeas investigator's declaration, is silent. Ramirez himself wouldn't provide a declaration, which is fishy in itself. Well, why is it fishy in itself? Same deal. He's been threatened. Listen, I don't want to get killed. People get killed all the time around here, and I don't want to be one of them. Well, he claims he was threatened by law enforcement, not gang members. And also, there's no evidence that when trial counsel interviewed Mr. Ramirez, you know, on the day of his testimony, that Mr. Ramirez said, oh, I'm reluctant to testify because I received this threatening phone call from somebody in law enforcement. There's no evidence that trial counsel was told that. The evidence is that Mr. Ramirez only told trial counsel, look, I can't remember the time that Mr. Oliveira has left my property, and I'm reluctant to testify. There's no evidence, there's no evidence that Mr. Ramirez told trial counsel about the threat as the reason why he was reluctant to testify, as opposed to a simple lapse of memory. And had Mr. Ramirez got on the stand and defense counsel attempted to rehabilitate him, as Your Honor suggests, objection, hearsay, sustained, because a failure to remember under California law is not a prior inconsistent statement. Had there been evidence that yes, Mr. Ramirez had been threatened, and therefore he was being evasive, and he was deliberately not, you know, he was feigning lack of memory, then that could have come in. But trial counsel was never on notice that the reason for Mr. Ramirez's going south was because of this alleged threat. There's no evidence of that. The evidence is simply that I can't remember, I'm reluctant to of either breaking a promise to the jury, or putting on a less than persuasive alibi defense, which the jury could view as, boy, gee whiz, Mr. Oliveira is trying to fabricate an alibi for the time of the crime. And then also, there was also negative evidence that was mixed up with the, with the proposed alibi evidence, was the fact that the proposed alibi placed Mr. Oliveira within two miles of Mr. Madrigal, the shooter, before the murder. So, if Mr., if trial counsel put on a less than persuasive alibi defense as to the time that, that Mr. Oliveira has allegedly left Mr. Ramirez's property, you would have the negative of Mr. Ramirez and Mr., excuse me, Mr. Oliveira's and Mr. Madrigal happening to work in very close proximity to each other, without the as to the time that Mr. Oliveira has allegedly left Ramirez's property. So, there, there was no deficient performance. Trial counsel is afforded wide latitude to make tactical decisions, and especially a difficult one like this. And, and I would also simply note as to the, the extra judicial, extra judicial statement by Mr. Madrigal. Mr. Madrigal does not implicate Mr. Oliveira's in the shooting. To the contrary, Mr. Madrigal says, the last time I saw Oliveira's was in April of 2000, which was three months prior to the shooting. So, with, with that, your honors, unless the court has any, any further questions, I would submit. One point. Counsel argues that the bulk of the defense case turned on Mr. Oliveira's having severed his ties with the, the gang and its members. So, at least there's the risk that the extra, the hearsay statements suggested a continued association with members two months before the event. Is, isn't that sufficient to be prejudicial? No, your honor. First of all, trial counsel's position was not that there's a difference between severing your ties with, with your former gang buddies and no longer being active in the gang. The fact that Mr. Oliveira's may have been seen with, with Torres at a hamburger stand several months before the shooting says nothing about. It was the person who was killed that arguably provided a motive for killing somebody else. Yes. Okay. Yes. But that, but the fact that Mr. Oliveira's happened to be at a hamburger stand with Torres several months prior to the shooting doesn't, doesn't say that Mr. Oliveira's is still active in the gang. The fact that he may know Torres doesn't mean that Oliveira's committed a drive-by shooting. You know, in fact, there was no evidence as to the relationship between Oliveira's and Torres aside from the fact that they were, you know, fellow gang members. There's no evidence that they were close friends. So, I think that, you know, Mr. Madrigal's statement actually, you know, contrary to implicating Mr. Oliveira's, actually exculpates him to the sense that Madrigal says, well, the last time I saw him was three months prior to the, prior to the shooting. And implicitly, he and I were not driving around shooting people. Yes. Okay. Yes. Yes. Madrigal's statement was in no sense a confession either. So, unless the Court has any further questions, I would submit the matter, Your Honors. Okay. Thank you. Thank you. Madrigal's statement not only tied my client to Torres, the murder victim that he supposedly then sought to avenge, but it also tied him to Madrigal. There was no evidence that he knew Madrigal other than that statement. Okay. Thank you. Thank you very much. Thank both sides for their helpful arguments. Oliveira v. Soto now submitted for decision.
judges: Singleton, Fletcher, Bybee